UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| O.M.A., S.r.l., | ) | 1:10CV0861 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | (Magistrate Judge Kenneth S. McHargh) |
| v. | ) | |
| | ) | |
| SIMON DeYOUNG CORP., | ) | |
| et al., | ) | |
| | ) | |
| Defendants | ) | REPORT AND |
| | ) | RECOMMMENDATION |

McHARGH, MAG. J.

The plaintiff O.M.A., S.r.l. ("OMA"), an Italian corporation[1], has filed a First

Amended Complaint (hereinafter, simply "complaint") against defendants Simon

DeYoung Corp. ("SDC"), Simon DeYoung ("DeYoung"), Ohio Braiding Machinery,

LLC ("OBM"), and unnamed John Does.  (Doc. 44.)  The complaint alleges nine

counts against the defendants:

> 1.  Breach of license agreements, against defendant Simon DeYoung
> Corp.;
>
> 2.  Breach of sales agency agreement, against defendant Simon
> DeYoung Corp.;
>
> 3.  Misappropriation of trade secrets and confidential and proprietary
> information and technology, against all defendants;
>
> 4.  Conversion, against all defendants;

---

[1]  The Italian abbreviation "S.r.l." stands for "Società a responsibilità
limitata," roughly equivalent to an American "Limited Liability Corporation."

5.  Breach of fiduciary duties, self-dealing, misuse of corporate resources and funds, theft of business opportunities, and diminishment of business assets, against defendants Simon DeYoung Corp. and Simon DeYoung;

6.  False advertising, against all defendants;

7.  Misrepresentations, against all defendants;

8.  Tortious interference, against all defendants; and,

9.  Unjust enrichment.

(Doc. 44.)  The named defendants filed an Answer and Counterclaim, alleging abuse of process.  (Doc. 48.)

The named defendants have filed a motion for partial summary judgment, seeking judgment on counts 1-4 and 9 of the complaint.  (Doc. 74-75.)  OMA has filed an opposition (doc. 80), and the defendants have filed a reply (doc. 84).

OMA has also filed a motion for partial summary judgment, seeking judgment on counts 3, 5, and 9.  (Doc. 73, 77.)  The defendants have filed an opposition (doc. 81), and the plaintiff has filed a reply (doc. 85).

## I.  FACTUAL BACKGROUND

After meeting at a trade show in the late 1980's, Mauro Nava, Managing Director of OMA, and Simon DeYoung, CEO of SDC, entered into a joint venture. (Doc. 77, at 1.)  The purpose of the joint venture was to market a "package" to customers consisting of SDC's braiding machine "carrier" and OMA's 240 FRC "horn" style braiding machine, and for OMA to finance the development of SDC's

own "rotary" style braiding machine.  (Doc. 77, at 1-2.)  On August 1, 1991, the parties signed the following agreements to evidence their joint venture:  (1) a Stock Purchase Agreement financing SDC's rotary braiding machine through OMA's purchase of 1,877.5 shares of stock (17.6%) in SDC ; (2) a Licensing Agreement, and; (3) a Sales Agency Agreement to appoint SDC as OMA's "exclusive sales agent." (Doc. 77, at 2.)  The agreements included clauses regarding the use and disclosure of each business's confidential information and technology.  Through the joint venture, SDC gained access to OMA's braiding machine, as well as spare machine parts, manuals, and other confidential documents about the braiding machine. (Doc. 77, at 3.)

In 2009, DeYoung formed a new corporation, Ohio Braiding Machinery, LLC ("OBM") and began producing and selling its own "horn" gear braiding machine. (Doc. 77, at 4.)  DeYoung did not inform OMA about his intent to begin directly competing with the OMA 240 FRC braiding machine.  (Doc. 77, at 5.)

## II.  SUMMARY JUDGMENT

Civil Rule 56 was totally revised by amendment effective December 2010. However, the Committee Note makes it clear that the standard for granting summary judgment remains unchanged, although the specific language of the Rule has been modified.

Summary judgment is appropriate where the record "shows that there is no genuine dispute as to any material fact and that the movant is entitled to a

3

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Non-moving parties may rest

neither upon the mere allegations of their pleadings nor upon general allegations

that issues of fact may exist.  See Bryant v. Commonwealth of Kentucky, 490 F.2d

1273, 1275 (6th Cir. 1974).  The Supreme Court held that:

> . . . Rule 56(c)[2] mandates the entry of summary judgment, after adequate
> time for discovery and upon motion, against a party who fails to make a
> showing sufficient to establish the existence of an element essential to that
> party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The evidence need not be in a

form admissible at trial in order to avoid summary judgment, but Rule 56(e)

requires the opposing party:

> to go beyond the pleadings and by [his] own affidavits, or by the "depositions,
> answers to interrogatories, and admissions on file," designate "specific facts
> showing that there is a genuine issue for trial."

Id. at 324.

The Sixth Circuit in Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir.

1989), has interpreted Celotex and two related cases, Anderson v. Liberty Lobby,

Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co., Ltd. v. Zenith

Radio, 475 U.S. 574 (1986), as establishing a "new era" of favorable regard for

summary judgment motions.  Street points out that the movant has the initial

burden of showing "the absence of a genuine issue of material fact" as to an

essential element of the non-movant's case.  This burden may be met by pointing

out to the court that the respondent, having had sufficient opportunity for

---

[2]  Now Rule 56(a).

4

discovery, has no evidence to support an essential element of his or her case. Street, 886 F.2d at 1479.

The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Id. In ruling on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion. Kraus v. Sobel Corrugated Containers, Inc., 915 F.2d 227, 229 (6th Cir. 1990).

The standard is slightly different for a plaintiff-movant, who would bear the burden of proof at trial.  OMA must present evidence that would entitle OMA to a directed verdict if that evidence were not controverted at trial.  If the defendants respond to the motion with controverting evidence which demonstrates a genuine issue of material fact, OMA's motion must be denied.  However, if, after analyzing the combined body of evidence presented by both parties, the evidence is such that no reasonable jury could find in favor of the defendants, then summary judgment will be entered on behalf of the plaintiff-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  See also Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1368-1369 (Fed. Cir. 2006); Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir.1986) (movant must establish all essential elements of claim or defense); McGrath v. City of Philadelphia, 864 F.Supp. 466, 473 (E.D. Pa. 1994)

5

(citing National State Bank v. Federal Reserve Bank of N.Y., 979 F.2d 1579, 1582 (3d Cir. 1992)).

A.  Federal Standard Distinct from Ohio Standard

At one point, the plaintiff misstates the standard for summary judgment in federal court:

> The moving party may not make conclusory assertions that the non-moving party has no evidence to prove its case.  The  moving party must specifically point to some evidence which demonstrates the non-moving party cannot support its claim.

(Doc. 80, at 2-3, citing Vahila v. Hall, 77 Ohio St.3d 421, 429, 674 N.E.2d 1164 (1997), and Dresher v. Burt, 75 Ohio St.3d 280, 662 N.E.2d 264 (1996) (emphasis added)).  OMA subsequently contends that defendants have not produced sufficient evidence to meet their burden on summary judgment.  (Doc. 80, at 19-19.)

The Ohio Supreme Court's plurality opinion in Dresher held that "the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims." Dresher, 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274 (1996) (emphasis in original).  The court stated that "the requirement that a party seeking summary judgment disclose the basis for the motion and support the motion with evidence is well founded in Ohio law." Id. at 294, 662 N.E.2d at 274.  In contrast, a movant in federal court is not required to prove a negative, i.e., to provide evidence to show that his opponent has no evidence.  Celotex, 477 U.S. at 323 (no express or implied requirement in Federal

6

Rule 56 that moving party support motion with affidavits or similar materials negating opponent's claim).

A federal court sitting in diversity must apply state substantive law, but federal procedural law. Hanna v. Plumer, 380 U.S. 460, 465 (1965); Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); Sofford v. Schindler Elevator Corp., 954 F.Supp. 1459, 1460 (D. Colo. 1997). Where there is a motion for summary judgment in a diversity case, the provisions of Federal Rule 56 control its determination. Reid v. Sears, Roebuck and Co., 790 F.2d 453, 459 (6th Cir. 1986). See also Gafford v. General Elec. Co., 997 F.2d 150, 165-166 (6th Cir. 1993); Reinke v. O'Connell, 790 F.2d 850, 851 (11th Cir. 1986). This court will therefore apply the federal standards for summary judgment outlined earlier.

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine dispute over any material fact. Celotex, 477 U.S. at 323; Wiley v. United States, 20 F.3d 222, 224 (6th Cir. 1994). The movant may discharge this burden either by producing evidence showing the absence of a genuine issue of material fact, or by " 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325; Wiley, 20 F.3d at 224. See also Street, 886 F.2d at 1479. The burden is not on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 325; Street, 886 F.2d at 1477-

7

1478.  Here, for example, the defendants may carry their initial burden by pointing

out to the court that OMA, having had sufficient opportunity for discovery, has no

evidence to support an essential element of its case.  Wiley, 20 F.3d at 224; Street,

886 F.2d at 1479.


### III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants have filed a motion for partial summary judgment, seeking

judgment on counts 1-4 and 9 of the complaint.  (Doc. 74-75.)

### A.  Counts One and Two

The defendants' motion first attacks the first and second counts together.

(Doc. 75, at 12-13.)  The first count of the complaint alleges that defendant Simon

DeYoung Corp. breached paragraphs 5, 6, and 8 of the Feb. 25, 2005, license

agreement between OMA and defendant Simon DeYoung Corp.  The relevant

paragraphs read:

> 5.  Improvements.  Any improvements relating to the Licensed
> Products or Inventions are hereby included within the scope of the
> License Agreement.  If a patent is granted for any improvement to the
> Licensed Products, Licensee [OMA] is granted a license, consistent
> with the terms set forth in this Agreement, for incorporation into and
> the eventual sale of the Licensed Invention.

> 6.  Sublicense and Assignment.  Licensee [OMA] shall not sublicense,
> assign or otherwise transfer the rights under this Agreement (except to
> an Affiliate which is defined below) without the prior written approval
> of the Licensor [Simon DeYoung Corp.].  For purposes of this
> Agreement, an Affiliate is defined as any wholly owned subsidiary of
> Licensee [OMA], or parent corporation which wholly owns Licensee, or
> any other wholly owned subsidiary of a common parent corporation.

8

Any unauthorized sublicense, assignment or transfer without the
Licensor's prior written approval shall be void.

* * * * *

8.  <u>Confidentiality</u>.  Each party hereto acknowledges that in the
performance of this Agreement, it will obtain knowledge of confidential
information and technology relating to the business of the other which
is not generally known or available to the public and which gives the
respective parties a competitive advantage in its business activities.  It
is agreed that Licensor and Licensee shall each preserve the
confidentiality of such information and not disclose information to any
other person or entity.  Such prohibition shall not apply, however, to
disclosure by either party to its employees, consultants, independent
contractors, patent representatives and attorneys to the extent
reasonably necessary to the performance of this Agreement; provided,
however, that each party shall take all reasonable steps to insure that
such confidential information is not disclosed or reproduced by such
employees, consultants, or independent contractors in contravention of
this provision.  The obligation of each party relating to such
confidential information shall survive termination of this Agreement.

(Doc. 44, PX B, License Agreement.)

The complaint alleges that Simon DeYoung Corp. breached the License

Agreement:

. . . when it, among other things, conspired with DeYoung and OBM in
the theft and disclosure of Plaintiff's confidential information and
technology and trade secrets for purposes of the development,
manufacture, and marketing of the OBM Knock-Off Machine and
further in its effective transfer of rights and its failure to advise
Plaintiff of certain carrier changes and/or improvements.

(Doc. 44, Compl., at ¶ 58.)

The second count of the complaint alleges that defendant Simon DeYoung

Corp. breached the Aug. 1, 1991, Sales Agency Agreement between OMA and

9

defendant Simon DeYoung Corp., in particular Section XXIV ("Cessation of Use"),

which reads:

> a)  Upon the termination of this Agreement OMA agrees to cease manufacturing and/or incorporating into a product manufactured by OMA, the carrier referred to in U.S. Patent No. 4,719,838, or any product which would be considered a development and/or improvement to said carrier.

> b)  Upon the termination of this Agreement Simon DeYouing [sic] agrees to cease manufacturing and/or incorporating into a product manufactured by Simon DeYoung[3], the track system manufactured by OMA, or any product which would be considered a development and/or improvement to said track system.

> c)  Should either party fail to cease manufacturing or incorporating the other's product, as set forth above, the other party may obtain injunction relief to stop the other from continuing operations in violation of this Section.

(Doc. 44, PX C, Sales Agency Agreement.)  The complaint alleges that Simon

DeYoung Corp. breached the Sales Agency Agreement:

> . . . when it, among other things, conspired with DeYoung and OBM in the theft of Plaintiff's confidential information and technology and trade secrets for purposes of the development, manufacture, and marketing of the OBM Knock-Off Machine.

(Doc. 44, Compl., at ¶ 64.)

In their motion, the defendants argue that OMA's claims of misappropriation

and other improper uses of confidential information must be limited to "the entirety

of the Type 240 Series Machine."  (Doc. 75, at 6-9.)  The defendants claim that the

complaint "is bereft of any details regarding which proprietary aspects of OMA's

---

[3]  In the Sales Agency Agreement, "Simon DeYoung" refers to the company, not the individual.  See generally doc. 44, PX C, "Recitals."

Type 240 Series braiding machines were misappropriated by Defendants and incorporated into the alleged knock off copy, OBM's 240-H machine."  (Doc. 75, at 6.)

The defendants assert they attempted, through discovery, to obtain a more specific description of the trade secrets or proprietary information alleged to be misappropriated, and received an interrogatory response which stated:

> Plaintiff contends that its trade secrets and other confidential and proprietary information were misappropriated and stolen by the Defendants from Plaintiff in their entirety when the Defendants decided to copy Plaintiff's machine and information and then design, manufacture, and market the OBM Knock-Off Machine.

(Doc. 75, at 6, quoting Plaintiff's Responses to First Set of Interrogatories.)  The defendants continued to attempt to receive a narrower response, and counsel for OMA responded as follows:

> OMA considers the entire OMA Type 240 braiding machine itself, as well as its underlying concepts, designs, developments, engineering, component sizing, material selection, and every other tangible and intangible element and process of such machine, proprietary. Furthermore, OMA considers its design strategies, procedures, machine testing processes, function, and development and improvements over time proprietary. . . . The entire machine along with each and every concept, component, and process are considered proprietary.

(Doc. 75, at 7, quoting Feb. 10, 2012, letter from counsel for OMA; see also doc. 77, PX 4, at 2.)

At deposition, in response to a question following up on his testimony that the trade secrets or confidential or propriety property reposed in how the machine is made, Mauro Nava, Managing Director of OMA, testified,

11

A.  . . . I repeat again, it's all together.  It's not just how the machine is put together or assembled.  It's all together, all the picture, the material, the treatment, the way the parts is made, the way the parts is assembled, it's all the complete package.

Q.  Well, how are the parts made that is confidential or proprietary?

A.  Because to reach that type of performances, only specific parts with specific components with specific treatment, with specific material can do it.  So this is why.

(Doc. 77, PX 7, Nava dep. (II), at 329-330.)

The defendants argue that OMA's allegations of misappropriation and other improper uses of confidential information are thus limited to the defendants having incorporated "the entirety of the technology of the OMA machine into the OBM 240-H machine." (Doc. 75, at 9.)  The court finds this assertion persuasive.

The defendants concede that they "are not contesting that OMA has trade secret rights in the design, configuration, materials, and methods of production of the OMA Type 240 braiding machine." (Doc. 84, at 6.)  However, the defendants claim that their OBM 240-H braiding machine differs from the OMA Type 240 Series braiding machine in numerous fundamental and material aspects.  (Doc. 75, at 9-12.)  They conclude that the "substantial differences in the configuration, materials, hardening processes, and suppliers used for these critical components" between the two machines are indisputable.  The defendants therefore assert that they are entitled to summary judgment on counts 1 and 2 "because no reasonable fact finder could find that SDC improperly stole and disclosed the entirety of the OMA machine." (Doc. 75, at 12-13; doc. 84, at 6.)

12

In response, OMA argues that the defendants breached the License Agreement "when SDC (through DeYoung) stole OMA's trade secrets and other confidential information which it gained through its special relationship with OMA." (Doc. 80, at 5.)  OMA states that the defendants then "secretly manufactured the OBM 240 H braiding machine, which has been determined to be 'definitely a knock-off copy of the OMA braiding machine (Type 240)' using the skill, expertise, confidential information, etc., provided to SDC and DeYoung by OMA," in violation of the License Agreement. (Doc. 80, at 6, quoting doc. 77, PX 1, Adams expert rpt., at 1.)

The court was unable to locate a judicial or legal definition of the phrase "knock-off copy" in the trade secrets or patent context, and OMA supplies no legal definition of the phrase.  It is unclear to the court whether OMA intends the phrase "knock-off copy" to indicate:  (1) an exactly duplicate, identical copy[4]; or (2) a machine which, although perhaps composed of different materials and manufactured differently, performs the exact same functions in the exact same way; or, (3) an inferior machine[5] which superficially resembles the original but perhaps does not perform the exact same functions as well or as efficiently.  Any of these

_____

   [4]  The defendants appear to favor this first definition.

   [5]  See, e.g., Webster's New World College Dictionary, at 793 (4th ed. 2007) ("Knock-off" defined as "a copy or imitation; esp., an inexpensive copy, as of a fashionable clothing design"); Merriam-Webster's Collegiate Dictionary, at 646 (10th ed. 1993) ("a copy that sells for less than the original; broadly: a copy or imitation of someone or something popular").

possible definitions could be commonly understood by the use of the phrase; OMA does not identify a legal definition of the phrase "knock-off copy" in the trade secrets context.

OMA also contends that "DeYoung admitted that he surreptitiously started Ohio Braiding Machinery LLC without telling OMA, SDC's minority shareholder." (Doc. 80, at 6.)  They also assert that "DeYoung admitted that he had secretly been working on the Ohio Braiding Machinery Knock-Off Machine behind OMA's back for years."  (Doc. 80, at 6, citing doc. 77, PX 5, DeYoung dep., at 130-133.)

DeYoung's deposition testimony reveals that he never explicitly informed OMA that he was "working on a competing machine that would rival OMA's 240 machine," although he implies that OMA could have learned that information from the SDC website.  (Doc. 77, PX 5, DeYoung dep., at 130-131.)  DeYoung testified that he did not believe that he, as president of SDC, had a fiduciary obligation to tell the shareholders, which included OMA as a minority shareholder, about his involvement with OBM and its development of a 240 machine.  Id. at 132-133.

OMA also states that SDC's accounting records "conclusively establish that the secret project to develop the Ohio Braiding Knock-Off Machine was facilitated by SDC."  (Doc. 80, at 6-7.)

In sum, in their opposition to the defendants' motion, OMA asserts that proof of defendants' "extensive misconduct" lies in:

> . . . their secret collection of information, secret and unauthorized
> funding of the development project; and secret manufacture of a
> competing machine behind the back of SDC's minority shareholder,

14

> MOA.  Indisputable proof of such breaches is found in the fact that the OBM 240 H braiding machine is – in all critical aspects – a replica, a copy of the OMA 240 H Braiding Machine.  It is a "Knock-off."

(Doc. 80, at 7.)

### 1.  Allegations of Count One

To return to the allegations of the complaint, the first count alleges that Simon DeYoung Corp. breached paragraphs 5, 6, and 8 of the License Agreement. The fifth paragraph concerns improvements to "the Licensed Products or Inventions," and states that if a patent is granted for any improvement, OMA will be granted a license to incorporate the improvement into the licensed invention. (Doc. 44, PX B, ¶ 5.)  The plaintiffs do not provide any evidence of any patent granted for any such improvement.

The sixth paragraph provides that OMA "shall not sublicense, assign or otherwise transfer the rights under this Agreement," except to a defined  "Affiliate," without the prior written approval of the Simon DeYoung Corp.  (Doc. 44, PX B, ¶ 6.)  Without such approval, any "unauthorized sublicense, assignment or transfer" shall be void.  Id.  The plaintiffs do not provide any evidence of any such unauthorized sublicense, assignment or transfer of rights.  Thus, the plaintiffs have not explicitly addressed an alleged breach of the specific terms under paragraphs 5 and 6 of the License Agreement, and summary judgment should be granted on those sub-claims.

The final allegation under the first count concerns an alleged breach of paragraph 8 ("Confidentiality") of the License Agreement.  The complaint alleges

15

that SDC breached the License Agreement by conspiring in "the theft and disclosure of Plaintiff's confidential information and technology and trade secrets for purposes of the development, manufacture, and marketing of the OBM Knock-Off Machine." (Doc. 44, Compl., at ¶ 58; see also doc. 80, at 5-6.)

OMA supports that allegation by stating that the defendants used OMA's proprietary information to secretly manufacture the competing OBM braiding machine, "which has been determined to be 'definitely a knock-off copy of the OMA braiding machine (Type 240)' using the skill, expertise, confidential information, etc., provided to SDC and DeYoung by OMA." (Doc. 80, at 6, quoting doc. 77, PX 1, Adams expert rpt., at 1.)  The Adams report states:

> The major and most obvious evidence for this is the close duplication of nearly all the essential internal machine component nominal dimensions of the OBM machine, which I measured, when compared to the OMA machine component dimensions which OMA supplied to me. To have such a close duplication of components' dimensions would not have been feasible without OBM having access to an OMA machine for a sufficiently long period of time to facilitate their measuring of components' detail dimensions of an OMA braiding machine.

(Doc. 77, PX 1, Adams expert rpt., at 1.)

Adams himself was apparently able to take those measurements with a precision micrometer in a single visit to the OBM facilities.  (Doc. 77, PX 1, Adams expert rpt., at 1.)  Adams notes that the defendants "had in their possession for several months one of the OMA braiding machines."  Id. at 2.  He says that the defendants would have been able to "observe and extract other product information" from this machine.  "The combination of actual machine component dimensions

16

with all such other extractable engineering information <u>from the OMA machine</u> is a clear unauthorized transference of pertinent OMA proprietary information for OBM's machine configuration."  (Doc. 77, <u>PX 1</u>, Adams expert rpt., at 2, emphasis added.)

In addition, Adams goes on to posit that, "if . . . [the defendants] had in their possession any additional information on the OMA machine such as drawings and design improvements, that would only further strengthen my above opinion regarding the unauthorized use . . . of OMA's braiding machine proprietary information."  (Doc. 77, <u>PX 1</u>, Adams expert rpt., at 2.)  However, Adams makes no finding as to specific drawings and design documents OMA may have had in its possession, nor does he indicate whether any such drawings and design documents would have constituted trade secrets or proprietary information, or whether these materials would have, in fact, actually enabled the alleged misappropriation.

In fact, Adam' expert opinion appears to find, without explicitly stating so, that the defendants reverse-engineered the OMA machine by measuring and analyzing a physical copy in their possession.  His report makes no factual finding on the alleged "theft and disclosure" of OMA's confidential information and trade secrets.

The Ohio Court of Appeals has pointed out:

Obviously there is no trade secret if any person skilled in the trade can take a sample of the product and reproduce it with all the desired operating characteristics, simply by examining and testing the sample without calling on the knowledge, experience and information of the first maker.  This is called either "reverse engineering" or

17

> "independent reproduction."  The test of successful reverse engineering
> is not whether the original product was copied, but whether the new
> product can be made so as to function exactly as does the original.

Valco Cincinnati, Inc. v. N&D Mach. Serv., Inc., No. C-830850, 1984 WL 7127, at *6 (Ohio Ct. App. Dec. 19, 1984), aff'd, 24 Ohio St.3d 41, 492 N.E.2d 814 (1986).   See also R&R Plastics, Inc. v. F.E. Myers Co., 92 Ohio App.3d 789,  637 N.E.2d 332 (Ohio Ct. App. 1993) (duplication of design features through "reverse engineering" in absence of confidential relationship will not support trade secret misappropriation claim).

OMA contends that "no other machine on the market can compete with the efficiency and production performances of the OMA FRC braiding machine."  (Doc. 80, at 13.)  No evidence is cited in support of this assertion.  OMA also asserts, again without citing evidence in support, that it is "a unique one-of-a-kind machine," and, with the exception of defendants' competing machine, "there is not a single machine like the OMA 240 FRC on the market."  (Doc. 80, at 11.)  OMA states that there is no evidence to contradict their assertion that, other than the defendants' machine, "the OMA FRC braiding machine is the only one of its kind on the market."  (Doc. 80, at 14, citing doc. 21, Nava decl., at ¶ 20; see also doc. 77, at 3, citing Nava decl., at ¶ 20.)  Of course, it is not defendants' burden, but rather OMA's, to produce evidence on this point.  Conclusory assertions in an affidavit are insufficient to raise a genuine issue of material fact.  See, e.g., Scaife v. Cook County, 446 F.3d 735, 740 (7th Cir. 2006) (citing cases); Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

18

The defendants argue that OMA's claims of misappropriation and other improper uses of confidential information are limited to "the entirety of the Type 240 Series Machine," and because there are numerous differences between the competing machines, "no reasonable fact finder could find that SDC improperly stole and disclosed the entirety of the OMA machine." (Doc. 75, at 6-9, 13.)  In support of defendants' motion, DeYoung's declarations detail a number of features, components, and materials which he asserts significantly distinguish the two machines, and states that the OMA machine is based on similar predecessors.   See doc. 75, at 9-12; doc. 14, DeYoung decl., at ¶¶ 16-17; doc. 78, DeYoung decl., at ¶¶ 44-66.

In its opposition to defendants' motion, OMA argues in response that DeYoung's declaration is irrelevant and inadmissible, and characterize it as "a set of conclusory assertions," which defendants subsequently cite "to the same assertions as a factual basis for their argument." (Doc. 80, at 9-10.)  OMA argues that the court should disregard the DeYoung declaration because DeYoung is not competent to testify on the matters discussed therein, and his declaration is hearsay, and not based on personal knowledge.  (Doc. 80, at 18.)  The court is unconvinced that DeYoung's declaration can be disregarded on that basis.  As defendants point out, DeYoung designed the OBM machine and is able to attest to the differing features based on his own personal knowledge.  See doc. 84, at 2.  In any event, DeYoung's declaration is not viewed by the court as "evidence," strictly speaking, at this stage, but merely as part of the movant's initial burden to point

19

out to the court the basis for its motion, identifying those portions of the record which the movant argues demonstrate that plaintiff lacks evidentiary support for its claims.

OMA does not respond, in its opposition to defendants' motion, to the numerous detailed assertions in the DeYoung declaration which distinguish the two braiding machines.  (Doc. 80, at 9-11; but see doc. 85, Reply, as discussed below.) Aside from dismissing a reference to a textile braiding machine as not relevant, OMA simply states that "OMA has presented extensive evidence to support its claim that the Ohio Braiding Knock-Off machine is a duplicate copy of the OMA 240 FRD."  (Doc. 80, at 10.)  In support of this statement, OMA cites to the Adams report, which has already been discussed above.  Id.  The Adams report supports a finding that the defendants reverse-engineered the OMA machine.

OMA cites as well to a "Summary Listing of Trade Secrets," which is a comparison of various features of the two competing machines.  See doc. 65, PX 3. However, this chart appears to have been compiled to support the proposition that "[t]he concept, design, function, and overall performance of the OMA 240 FRC Braiding Machine, as well as the following – and their combination – are trade secrets and confidential and proprietary information as referenced in Plaintiff';s Complaint."  Doc. 65, PX 3, at 2.  This document does not respond to the defendants' detailed listing of features, components, and materials which they contend significantly distinguish the two machines.  See, e.g., doc. 84, at 5-6.  Nor does the

Adams report address these purported distinctions.  See generally doc. 77, PX 1,
Adams expert rpt.; see also doc. 81, DX 1, Adams dep., at 103.

OMA also cites, generally, to the deposition testimony of Mauro Nava, Simon
Arden DeYoung, and Mark DeYoung, without citing to any specific portion of their
testimony.  (Doc. 80, at 10.)  As to this deposition testimony, OMA has failed to
carry its affirmative burden "to direct the court's attention to the specific portions of
the record upon which it seeks to rely to create a genuine issue of material fact."
Primes v. Reno, 999 F.Supp. 1007, 1010 (N.D. Ohio 1998), aff'd, 190 F.3d 765 (6th
Cir. 1999) (emphasis added); see also In re St. Clair Clinic, Inc., 73 F.3d 362, 1996
WL 6531, at *2 (6th Cir. 1996) (TABLE, text in WESTLAW) (citing Guarino v.
Brookfield Twp. Trustees, 980 F.2d 399, 405-407 (6th Cir. 1992)); Nissho-Iwai Am.
Corp., 845 F.2d 1300, 1307 (5th Cir. 1988).  The court is not required to search
through the transcripts of depositions to find evidence which might support OMA's
claims.  Id.

The court notes that Nava testified for OMA that confidential or proprietary
specific combinations of specific individual parts and components, made of specific
materials, enabled the OMA machine to achieve its unique performance.  (Doc. 77,
PX 7, Nava dep. (II), at 330.)  The main focus of the defendants' motion is that the
two machines are not identical, and because OMA has repeatedly contended  that
the defendants' machine was misappropriated in its entirety, the court should find
that there was no misappropriation.  As already noted, DeYoung's declaration lists
numerous differences in construction and materials used in the two machines.

21

(Doc. 78, DeYoung decl., at ¶¶ 44-66; see also doc. 75, at 10-12.)  Nava's testimony
as to the necessity of "specific parts with specific components with specific
treatment, with specific material," in order for the OMA braiding machine to
perform as designed, would appear to distinguish the OBM machine, which is
comprised of differing materials and components, in contravention of OMA's "trade
secret" theory.  Thus, the defendants argue that, because there are numerous
differences between the competing machines, "no reasonable fact finder could find
that SDC improperly stole and disclosed the entirety of the OMA machine."  (Doc.
75, at 12-13.)

In their reply[6] in support of their own motion for summary judgment, OMA
finally addresses the defendants' factual arguments that, because there are
numerous differences between the competing machines, it cannot be found that they
misappropriated the entirety of the OMA machine.  See doc. 85.  Moving away from
its fundamental theory that the defendants misappropriated their trade secrets
because "[t]he entire machine along with each and every . . . component" is
considered proprietary (see, e.g., doc. 77, PX 4, at 2), and that "only specific parts
with specific components with specific treatment, with specific material" are
required for its unique performance (doc. 77, PX 7, Nava dep. (II), at 329-330), OMA

_____

6  It is generally disfavored to raise new factual issues in a reply brief.  See
generally Novosteel, SA v. United States, 284 F.3d 1261, 1273-1274 (Fed. Cir. 2002)
(reply brief does not provide opportunity to present new issue); see also Alston v.
Forsyth, No. 10–1180, 2010 WL 1918693, at *2 (3d Cir. May 13, 2010); Scottsdale
Ins. Co. v. Flowers, 513 F.3d 546, 553 (6th Cir. 2007); United States v. Crozier, 259
F.3d 503, 517 (6th Cir. 2001), cert. denied, 534 U.S. 1149 (2002).

in its reply argues that the numerous differences in components, construction, and design, pointed out by the defendants, are "of no consequence and have no bearing on the overall form or function of these machines."  See, e.g., doc. 85, at 6.

OMA's reply in support of their motion for summary judgment discusses several purported distinctions, for example:

> The Defendants report that the OBM 240 H track uses a specified cast iron material while OMA uses a high strength steel alloy material. Notably, although the materials used in these tracks may or may not undergo different hardening processes, the end result – a track with sufficient hardness and tensile strength  – is the same.

(Doc. 85, at 4.)  The court is apparently intended to infer that Nava's testimony that "only specific parts with specific components with specific treatment, with specific material" are required for the OMA machine's unique performance (doc. 77, PX 7, Nava dep. (II), at 329-330), is inapplicable to the track system under discussion.  In any event, this contention, that the end result is the same, despite the difference in materials and the hardening process, is not supported by any citation to evidence in the record.

As another example, OMA dismisses the distinction that defendants attempt to draw concerning a one-piece versus a two-piece horn gear:

> The fact that the Defendants have welded together the OBM 240 H's horn gear is not a meaningful distinction.  In fact, once the two pieces are welded together they become a single piece that can no longer be split . . .

(Doc. 85, at 6.)  Again, apparently Nava's testimony that "only specific parts with specific components with specific treatment, with specific material" are required

(doc. 77, PX 7, Nava dep. (II), at 329-330), is inapplicable to the horn gears under discussion.  Again, OMA's contention, that defendants' two-piece, welded, horn gear is functionally the same as OBM's one-piece horn gear, despite the difference in specific components of the specific parts, is not supported by any citation to evidence in the record.

OMA also contends that defendants' asserted material distinction concerning the hardening processes of the competing machines' gears is "ridiculous."  (Doc. 85, at 7.)  OMA states, again without any evidentiary support:  "These alleged 'differences' between the OBM 240 H and the OMAA 240 FRC are of no consequence and have no bearing on the overall form or function of these machines."  Id.  Similarly, OMA argues that "the Defendants' attempt to use the hardening processes of the competing machines' foots – as a 'material distinction' – is improper because such has no bearing on the overall form or function of these machines."  (Doc. 85, at 8.)  At this point, it goes without saying that this assertion is unsupported.

In OMA's reply in support of its motion, OMA seems to have shifted the focus of its claims.  In discovery, counsel for OMA asserted:  "The entire machine along with each and every concept, component, and process are considered proprietary." (Doc. 77, PX 4, at 2.)  In OMA's reply in support of their motion for summary judgment, at least, the focus is less on "each and every" component, and apparently more on the overall function or process.  Rather than contending that "the entire machine" as a whole is proprietary, the reply appears to move toward a theory that

24

the relevant point is that the two competing machines are functionally the same machine.

In Arco Indus. Corp. v. Chemcast Corp., the plaintiff's trade secret claim (under Michigan law) was based on its "layout" and "approach" to producing grommets. Arco Indus. Corp. v. Chemcast Corp., 633 F.2d 435, 442 (6th Cir. 1980). The Sixth Circuit, reversing the district court, found several flaws in plaintiff's argument:

> Certainly it is possible that a new combination of known steps or processes can be entitled to trade secret protection.  However, Arco failed to show specifically what it claimed as its protectable layout and approach.  Arco never showed that the combination achieved in its overall layout and approach was in any way novel.

Arco, 633 F.2d at 442.  In contrast, in Columbus Steel Castings Co. v. Alliance Castings Co., "there was testimony that although certain components of the design were readily ascertainable, the machine as a whole was unique and afforded a competitive advantage to Columbus Steel."  Columbus Steel Castings Co. v. Alliance Castings Co., No. 11AP-351, 2011 WL 6931518, at *6 (Ohio Ct. App. Dec. 30, 2011).  There is a lack of such evidence here, although defendants do not contest the "trade secret" status of the OMA machine, but rather whether they have misappropriated the entire machine, such that the agreements that are the subject of counts one and two were breached.

### 2.  Allegations of Count Two

The second count similarly alleges that Simon DeYoung Corp. breached Section XXIV ("Cessation of Use") of the Sales Agency Agreement, by conspiring in

25

the theft of OMA's confidential information, technology and trade secrets for purposes of the development, manufacture, and marketing of "the OBM Knock-Off Machine." (Doc. 44, Compl., at ¶ 64.)  Under the Cessation of Use section, SDC agreed to "cease manufacturing and/or incorporating into a product manufactured by Simon DeYoung, the track system manufactured by OMA, or any product which would be considered a development and/or improvement to said track system." (Doc. 44, PX C, Sect. XXIV.b.)  Should either party violate Sect. XXIV.b. of the Sales Agency Agreement, "the other party may obtain injunction relief to stop the other from continuing operations in violation of this Section."  (Doc. 44, PX C , Sect. XXIV.c.)  In the complaint, OMA does not appear to seek the injunctive relief referred to in the Sales Agency Agreement.  See generally doc. 44, Compl., at ¶¶ 62-67; see also pp. 26-27.

As mentioned earlier, defendants assert that they are entitled to summary judgment "because no reasonable fact finder could find that SDC improperly stole and disclosed the entirety of the OMA machine." (Doc. 75, at 13.)  The court notes that the Cessation of Use section cited, by its plain terms, would seem to pertain only to "the track system manufactured by OMA, or any product which would be considered a development and/or improvement to said track system." (Doc. 44, PX C, Sect. XXIV.b.)  In addition, the defendants argue that the 1991 Sales Agreement terminated in 1996, that OMA began to use a new track system in 1998, and the track system used in the OBM machine is completely distinct from the track system used in the relevant period governed by the Sales Agreement.  See generally doc.

26

84, at 7.  The plaintiffs assert that the fact that "Defendants have produced a 'knock-off' copy of the OMA 240 FRC is conclusive proof of such violation and breach."  (Doc. 80, at 8.)  They do not provide any specific evidence relating to the track system which appears to the subject of Section XXIV.

The plaintiff's burden in responding to a motion on summary judgment is to designate facts showing that there is a genuine issue for trial as to whether the defendants misappropriated the OMA machine.  OMA has failed to do so.  The defendants' motion for summary judgment should be granted as to counts 1 and 2.

## B.  Count Three:  Misappropriation

The third count of the complaint alleges misappropriation of trade secrets and confidential and proprietary information and technology, against all defendants.  (Doc. 44, Compl., at ¶¶ 68-77.)  The complaint alleges that DeYoung, in his capacity as a trusted colleague, and SDC, in its capacity as a trusted licensee of OMA's technology and as OMA's "exclusive agent," obtained OMA's trade secrets and confidential and proprietary information and technology.  (Doc. 44, at ¶ 69.) Further, it is alleged that "DeYoung, SDC, and OBM, who are aware of the confidential and proprietary nature of [OMA's] trade secrets, have misappropriated and unlawfully used [OMA's] trade secrets – through improper means – to design manufacture, and market the OBM Knock-Off Machine."  (Doc. 44, at ¶ 70.)

The complaint alleges that OMA went to great expense to discover, develop, and assemble its confidential and proprietary information and trade secrets, took

27

reasonable steps to protect its trade secrets for its own use, and did not give the defendants consent to use its trade secrets.  (Doc. 44, at ¶¶ 71, 73.)  At the summary judgment stage, OMA of course must go beyond the allegations of its complaint. Celotex, 477 U.S. at 324.

The defendants contend that the undisputed evidence does not support the third claim, "as the OBM 240-H braiding machine differs from the OMA Type 240 Series machine in numerous, fundamental ways."  The defendants assert that they are entitled to summary judgment "because the evidence does not support OMA's claim that the OBM machine is a knock off copy of the entirety of the OMA machine."  (Doc. 75, at 13.)

While the parties' contractual obligations regarding confidential information and trade secrets are set forth to some extent in the license and sales agreements, there is nevertheless a statutory cause of action for misappropriation of trade secrets under Ohio law.  Thermodyn Corp. v. 3M Co., 593 F.Supp.2d 972, 987 (N.D. Ohio 2008) (trade secrets defined by law, not by parties to contract).  Under the Ohio statute, "misappropriation" means any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

28

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Columbus Steel Castings Co. v. Alliance Castings Co., No. 11AP-351, 2011 WL 6931518, at *7 (Ohio Ct. App. Dec. 30, 2011) (quoting Ohio Rev. Code § 1333.61(B)). " 'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Columbus Steel Castings, 2011 WL 6931518, at *7 (quoting Ohio Rev. Code § 1333.61(A)).

OMA asserts that defendants "misappropriated OMA's trade secrets when – using their unique access to OMA's plans, drawings, 240 FRC machines, and components – they stole the concepts, designs, processes and functions of such machines and used them to create the Ohio Braiding Knock-Off machine." (Doc. 80, at 13.)  In sum, OMA alleges a violation of Ohio Rev. Code § 1333.61(B)(2)(b).  The allegations are that the defendants used OMA's trade secrets, without OMA's consent, which secrets they had "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  Ohio Rev. Code § 1333.61(B)(2)(b).  For example, OMA contends that the defendants obtained their machine "for the

purposes of using it as a 'display' or 'model' to show potential customers – but . . . utilized that access to study and copy the machine . . ." (Doc. 80, at 12 n.7.)

Under Ohio law, a plaintiff must show, by a preponderance of the evidence, three things to establish a cause of action for wrongful appropriation of trade secrets:  "First, a plaintiff must show that a trade secret exists.  Second, the plaintiff must establish that the trade secret was acquired as a result of a confidential relationship, and third, . . .the unauthorized use of the secret." Penetone Corp. v. Palchem, Inc., 627 F.Supp. 997, 1005 (N.D. Ohio 1985).

The defendants concede the existence of trade secrets, but contest the third element, the unauthorized use of the trade secrets.  (Doc. 84, at 6.)  The defendants contend that OMA's allegations of misappropriation are limited to the defendants having incorporated "the entirety of the technology of the OMA machine into the OBM 240-H machine." (Doc. 75, at 9.)  As discussed already, the  defendants assert that they are entitled to summary judgment "because the evidence does not support OMA's claim that the OBM machine is a knock off copy of the entirety of the OMA machine." (Doc. 75, at 13.)  The court has found that OMA has failed to designate specific facts showing that there is a genuine issue for trial as to whether the defendants misappropriated OMA's trade secrets.

The motion for summary judgment should be granted as to count 3.

30

## C.  Counts Four and Nine:  Preemption

The defendants contend that the fourth and ninth counts of the complaint are preempted by the Ohio statute[7].  (Doc. 75, at 13-14.)  The fourth count of the complaint alleges conversion, against all defendants, and the ninth count is for unjust enrichment.  See generally doc. 44, at ¶¶ 78-87, 115-121.

The Ohio trade secrets statute provides that, with three specific exceptions, the statute displaces "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret."  Office Depot, Inc. v. Impact Office Prod., LLC, 821 F.Supp.2d 912, 918 (N.D. Ohio 2011); Thermodyn, 593 F.Supp.2d at 988-989 (quoting Ohio Rev. Code § 1333.67(A)).  The statutory exceptions to preemption are (1) contractual remedies "whether or not based on misappropriation of a trade secret," (2) other civil remedies not based on misappropriation of a trade secret, and (3) criminal remedies.  Office Depot, 821 F.Supp.2d at 918; Thermodyn, 593 F.Supp.2d at 989 (quoting Ohio Rev. Code § 1333.67(B)).

Thus, courts have found that the Ohio trade secrets statute preempts claims for conversion and unjust enrichment based on allegations of misappropriation of trade secrets.  Miami Valley Mobile Health Serv., Inc. v. ExamOne Worldwide, Inc., 852 F.Supp.2d 925, 940-941 (S.D. Ohio 2012) (conversion); Office Depot, 821

---

[7]  It is clear that OMA is proceeding under the Ohio statute, explicitly citing its elements in the complaint.  See doc. 44, compl., at ¶¶ 72, 74; Ohio Rev. Code § 1333.61(D).

F.Supp.2d at 922 (unjust enrichment); Thermodyn, 593 F.Supp.2d at 989 (conversion, unjust enrichment).

The test to determine whether a state law claim is preempted under this statute is to determine whether "the claims are no more than a restatement of the same operative facts" that form the basis of the statutory claim for trade secret misappropriation.  Thermodyn, 593 F.Supp.2d at 989.  In other words, such a claim survives preemption only if a plaintiff alleges factual matters beyond misappropriation of trade secrets.  Office Depot, 821 F.Supp.2d at 919.  Where the allegations supporting the common-law claim(s) are "merely a restatement of the same operative facts" of the trade secrets claim, the claims will be preempted.  Id. at 921.  Where the common-law claim has an "individual factual basis" separate from the allegations of the trade secrets claim, it may survive.  Id.

The complaint alleges the conversion claim, in relevant part, as follows:

79.  Defendants have intentionally and unlawfully exercised dominion and control over, have retained, and have otherwise utilized the property of Plaintiff without authority to do so, including the knowledge, plans, drawings, designs, improvements, enhancements, modifications, drawings, technical documents, repair procedures, and other confidential information and technology and have exercised dominion and control over such property, materials, and information to the exclusion and detriment of Plaintiff.

80. Plaintiff owns the knowledge, plans, drawings, designs, improvements, enhancements, modifications, drawings, technical documents, repair procedures, and other confidential information and technology of and concerning its OMA Type 240 Series Braiding Machine and is entitled to the immediate possession and exclusive use thereof.

(Doc. 44, ¶¶ 79-80.)

Similarly, the complaint alleges unjust enrichment, in relevant part, as follows:

> 116. Defendants knowingly, intentionally, and unlawfully utilized the property of Plaintiff, including the machines, products, equipment, knowledge, plans, drawings, designs, improvements, enhancements, modifications, drawings, technical documents, repair procedures, and other confidential information and technology, and have exercised dominion and control over such property, material, and information, to the exclusion and detriment of Plaintiff, who suffered damages due to Defendants' unlawful acts.
>
> 117. Defendants knowingly received and utilized the benefits the property of Plaintiff, including the machines, products, equipment, knowledge, plans, drawings, designs, improvements, enhancements, modifications, drawings, technical documents, repair procedures, and other confidential information and technology, for the purposes of benefitting, promoting, operating, and profiting therefrom, to the detriment of Plaintiff, who has suffered damages in an amount in excess of $1,000,000.00.
>
> 118. Defendants have unjustly and inequitably retained these benefits – which in justice and equity rightfully belong to Plaintiff.

(Doc. 44, ¶¶ 79-80.)

It is abundantly clear from the complaint and the briefing of the parties that the dispute in this case, although involving various theories of law which have been incorporated into the complaint, is based on OMA's overarching allegation that the defendants have improperly manufactured and sold a competing braiding machine, based on trade secrets and proprietary information purloined or improperly used by the defendants from OMA.  There is no allegation that the alleged misappropriation, or conversion (as well as the resulting unjust enrichment), of OMA' s knowledge, plans, drawings, designs, improvements, enhancements,

33

technical documents, and so forth, served any other purpose for the defendants other than the manufacture and sale of the competing braiding machine.

Therefore, the court finds that the claims of conversion and unjust enrichment involve no more than a restatement of the same operative facts that form the basis of OMA's statutory claim for trade secret misappropriation, and those common-law claims are preempted.

## IV.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The plaintiff OMA has also filed a motion for partial summary judgment, seeking judgment on counts 3, 5, and 9 of the complaint.  (Doc. 73, 77.)

The plaintiff, who would bear the burden of proof at trial, has a heavier burden on its motion for summary judgment.  As discussed earlier, OMA must present evidence that would entitle OMA to a directed verdict if that evidence were not controverted at trial.  If the defendants respond with controverting evidence which demonstrates a genuine issue of material fact, OMA's motion must be denied. Fitzpatrick, 2 F.3d at 1115.  See also Saab, 434 F.3d at 1368-1369; Fontenot, 780 F.2d at 1194.

### A.  Count Three:  Misappropriation

The third claim, as discussed more fully earlier, alleges misappropriation of trade secrets and confidential and proprietary information.  OMA's motion for summary judgment should be denied on count three, because the evidence put

forward by OMA does not rise to the level that no reasonable jury could find in favor of the defendant on that issue.

## B.  Count Five:  Breach of Fiduciary Duties

The fifth claim alleges breach of fiduciary duties, self-dealing, misuse of corporate resources and funds, theft of business opportunities, and diminishment of business assets, against defendants Simon DeYoung Corp. and Simon DeYoung.

OMA asserts that summary judgment is proper regarding Count 5 (breach of fiduciary duties) because DeYoung breached his fiduciary obligations to OMA by establishing a new corporation and producing his own "knock-off" braiding machine. (Doc. 77, at 18.)  A fiduciary has been defined as "a person having a duty, created by his or her undertaking, to act primarily for the benefit of another in matters concerning such undertaking." Camp St. Mary's Assn. of W. Ohio Conference of the United Methodist Church v. Otterbein Homes, 176 Ohio App.3d 54, 68, 889 N.E.2d 1066, 1077 (2008).   A plaintiff claiming a breach of fiduciary duty must demonstrate the following elements: (1) the existence of a duty arising from a fiduciary relationship; (2) failure to observe the duty, and; (3) an injury resulting proximately therefrom.  Id. at 1076.

Majority shareholders in a closely held corporation have a heightened fiduciary duty of "utmost good faith and loyalty" to the minority shareholders. Estate of Schroer v. Stamco Supply, Inc., 19 Ohio App.3d 34, 482 N.E.2d 975 (1984), paragraph one of the syllabus; see also Priebe v. O'Malley, 89 Ohio App.3d 8, 12,

35

623 N.E.2d, 573 (1999).  Majority shareholders have a fiduciary duty to conduct, manage, and direct the corporation's affairs in best interests of the corporation. Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1407 (6th Cir. 1991). Majority shareholders also have an obligation to disclose all "material information relevant to corporate decisions from which they may derive a personal benefit." Allied Paper, Inc., v. H.M. Holdings, Inc., 86 Ohio App.3d 8, 19, 619 N.E.2d 1121, 1129 (1993).  A court of equity will grant appropriate relief where the majority or dominant group of shareholders act in their own interest or in the interest of others so as to oppress the minority or commit fraud upon their rights.  Crosby v. Beam, 47 Ohio St.3d 105, 109, 548 N.E.2d 217, 221 (1989).

Plaintiff OMA contends that De Young, a majority shareholder with 76.6% of SDC stock, owed a fiduciary duty to OMA, a minority shareholder of SDC.  (Doc. 77, at 16-17.)  Plaintiff argues that DeYoung breached his fiduciary duties to OMA by (1) establishing OBM, a separate corporation, to manufacture and sell the "knock off" machines, and; (2) providing OBM with SDC's employees, equipment, and funding in order to create OBM's "knock off machine."  (Doc. 77, at 17-18.) Plaintiff claims De Young's actions constitute self-dealing and stolen business opportunities from SDC and harmed OMA financially as a minority shareholder.  (Doc. 77, at 18.)

Defendants do not dispute the existence of a fiduciary duty towards OMA. Rather, defendants assert that DeYoung did not breach his fiduciary duties because he was acting in the best interests of SDC.  (Doc. 81, at 7.)  Defendants claim that OBM paid SDC $10,000 for each machine sold in exchange for using SDC's

36

resources, which helped SDC offset the dramatic reduction in revenue from OMA as their joint venture was ending.  (Doc. 81, at 8.)  Moreover, Defendants assert that forming OBM as a new corporation fulfilled DeYoung's fiduciary obligations because doing so protected SDC and its shareholders form the risks associated with the new business. (Doc. 81, at 7.)

Defendants cite Crosby, in which the Supreme Court of Ohio held that a majority shareholder must conduct the corporation's affairs with "an eye single to the best interests of the corporation." Crosby, 47 Ohio St.3d at 109. Defendants argue that DeYoung did act with a "single eye" to SDC's and OMA's best interests as a shareholder, and the extent to which De Young's actions did not benefit OMA's best interests as a manufacturer of braiding machines is irrelevant to De Young's fiduciary duties. (Doc. 81, at 9.)

In reply, plaintiff contends that defendants' statements are "biased and conclusory" and do not raise a genuine issue of material fact. (Doc. 85, at 9.) Plaintiff does not provide any citations to authoritative law in support of this argument – only citations to the record.

OMA as plaintiff has not met its burden for summary judgment.  Specifically, Plaintiff has not demonstrated the absence of a genuine issue of material fact with respect to DeYoung's breach of his fiduciary duties.  A reasonable fact finder could differ on this issue.  Therefore, the plaintiff's motion for summary judgment with respect to Count 5 (breach of fiduciary duties) should be denied.

C.  Count Nine:  Unjust Enrichment

The ninth claim, as outlined earlier, is unjust enrichment.  OMA's motion should be denied on count nine, because the common-law claim is preempted by the Ohio statute.


V.  SUMMARY

The defendants' motion (doc. 74, 75) for summary judgment should be granted on counts four and nine, because these common-law claims are preempted by the Ohio statute.  The defendants' motion for summary judgment should be granted on counts 1-3, because OMA has failed to designate facts showing that there is a genuine issue for trial as to whether the defendants misappropriated OMA's trade secrets.

OMA's motion (doc. 73, 77) for summary judgment should be denied on count three, because the evidence does not rise to the level that no reasonable jury could find in favor of the defendant on that issue.  OMA's motion for judgment on count 5 (breach of fiduciary duties) and count 9 (unjust enrichment) should also be denied.

## RECOMMENDATION

It is recommended that the defendant's motion for summary judgment be granted, and the plaintiff's motion be denied.


Dated:  Mar. 12, 2013            /s/ Kenneth S. McHargh
                                 Kenneth S. McHargh
                                 United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).